Thank you, Your Honor. Allen Brabender, representing the U.S. Forest Service and the Federal Defendants in this case. If I could, I'd like to reserve five minutes for rebuttal. Sure. This case is essentially two different appeals, one brought by the Forest Service in response to a grant of summary judgment to the Montana... Slow down just a little bit. To the Montana Wilderness... Judge Gould has to listen to it. ...Association. And the second appeal is an appeal filed by the recreation group Citizens for Balanced Use in response to a grant of summary judgment to the Forest Service. I will concentrate largely on the Forest Service's affirmative appeal, but will address the recreation group's arguments to the extent there's time and interest of the court. Okay. These cases, and the case that follows in the rest of the country, illustrate the difficulty of the Forest Service's task in managing the national forests. No matter what the Forest Service does, one interest group or another is dissatisfied, and usually all interest groups are dissatisfied. Here, the Forest Service substantially reduced the number of trail miles available to motorized recreation and acres available to motorized recreation, yet the Wilderness Association is still unhappy, claiming it didn't go far enough. Yet the recreation groups here and in Russell country claim that the Forest Service went too far. No matter what the Forest Service does, one interest group or another goes running to whatever judge in Montana is most sympathetic to their cause and claims that the Forest Service has violated the law. But the Forest Service has not violated the law. It has complied with the National Environmental Policy Act, and it has complied with the Montana Wilderness Study Act of 1977. I will begin with the Study Act. The Study Act created nine wilderness study areas in Montana. Counsel, I think we know what the parameters are. To help you focus your argument, and my colleagues may have their own questions, I'm trying to understand on the study area analysis on the volume aspect that seemed to trouble Judge Malloy, and I have to say I'm a little wondering myself. The whole purpose, as I understand of this structure, is 1977 Congress has a grand plan with a time frame, which as you implicitly referred to in your opening statement, has not been implemented. That is, these are being maintained well beyond any time frame that was apparently contemplated by Congress. And Judge Malloy recognized that. But the thing that is unclear, certainly to me, is how the volume increase got factored into the analysis, if at all. There's no data on volume. So there's statements in the government, the FEIS, which indicates, well, we don't need it. So is your position that the volume increase is not a relevant factor, or are there other ways in which you took into account the impact of volume, and if so, what is it and where is it explained as to how you accounted for what seems obvious? If you have more volume of motorized usage in this area, there's at least noise and emissions and whatever. Solitude apparently is the factor that's most in play here, as best I can figure out. So can you explain in cogent terms and show us where that's addressed in the report? Sure, Your Honor. And it all falls back to what Congress asked the agency to do in the Study Act, and that is to assess whether these areas had the physical wilderness state to be designated as wilderness. And that's what the Forest Service looks to here, the physical wilderness characteristics of the area. Congress was not necessarily concerned with use, because use can be controlled by legislation. Use can be prohibited by the Wilderness Act. What Congress wanted to know in the Study Act was whether these areas had the physical characteristics of a wilderness area. Now, volume of use is something that the Forest Service considers and does believe is relevant. It simply doesn't believe it is essential to the Study Act analysis. What is essential are the physical characteristics and the changes to it. To the extent volume of use has some sort of physical impact on the landscape, and particularly on the landscape from 1977 levels, that is something the Forest Service absolutely considers. And you can see that in this record by looking to what the Forest Service did with ATVs. In 1977, only single-track trails existed, and ATVs did not exist in 1977 in their current form. But ATVs now use the study area and have created dual-track trails. Because a dual-track trail looks different and appears different than a single-track trail, the Forest Service decided to prohibit ATVs from using the study area. That is an example of a particular use having a physical impact on the landscape, and that's how the… Council, if I could ask you a question. Let's put aside physical impact of a different-sized trail, and let's just take a trail that's the same, but assume there are twice as many vehicles on it. Does that have an impact? Does the noise and the traffic and the emissions, does that have an impact on wildlife in the areas adjacent to the trail? It may have some impact, Your Honor, that's true. Okay, well, here's the problem I'm having with your argument, so I'll just put it on the table, and then I'll listen to your answer. But I thought that in the act that Congress asked that the essential wilderness character of the area be maintained. And if Congress says maintain the essential wilderness character, I don't see how that can be done without considering usage, because frequency of usage, in a common sense way at least, seems like it would affect the character as far as the animals are concerned, as far as the trees are concerned, and as far as, let's say, a solo hiker would be concerned. So what's the answer to that? Well, again, I think it falls back to what Congress intended for the Forest Service to do in the Study Act, which is to assess whether the area had the physical characteristics of a wilderness. And the Forest Service then interprets the Study Act to require it to maintain the physical characteristics of the wilderness. And use may have some impact, but that's not what's relevant to the Study Act analysis. Why not? What if the emissions cause the trees to, as they do in the Arrowhead area, for example, that I'm familiar with? Well, then every... I'm sorry, Your Honor. You have time enough to listen to the questions, okay? The trees become diseased or affected by the smog in that case, okay? So, you know, the vegetation can be impacted. The wildlife can be drawn around. There's some reference in the FEIS, or the report, which talks about, well, these are temporary. So are you saying, well, the Service looks at it and says, yes, they can have short-term impact, but when Congress decides it will be a wilderness area permanently, you can then remove all that, and it will come back and be restored? Judge Gould has got the same issue I've got. I'm trying to understand how you're maintaining something if you're allowing some degradation. Well, if the trees were impacted, Your Honor, that would be a physical impact on the environment that the Forest Service would consider. Is there anything in the report that talks about why the increased volume doesn't have adverse impacts of the kind posited by Judge Gould? There are several places in the record that this Court can look to. A Forest Service employee drove thousands of miles of trail in, I think, the peak seasons in 2004, 2005, somewhere around there, and his observations are important in two ways. First, despite driving thousands of miles of trail, he rarely encountered another motorized vehicle. So while uses have increased since 1977, motorized use still is not that common in the forest and in the study area. And second, he observed that there was very little trail damage, that the trails were in good shape. And you can see this discussion referenced in our excerpts of record at page 251 and in the Recreation Group's excerpts of record at 346. And this comports with the science out there showing that the damage to the forest occurs initially, or most occurs, with the creation of the trail itself, that use has very little impact on the trail. It's the actual physical presence of the trail and its creation that has the most impact. And you can see this in the record of decision at page 100 and in the final environmental impact statement at chapter 3, page 521 and 522. So the Forest Service's analysis shows that the trails are being maintained essentially at 1977 levels, and there were some impacts, but the Forest Service took that into account and drafted a plan to maintain the wilderness characteristics or character at that level. And it did so, as I mentioned, first by prohibiting ATVs, second by reducing the number of trails available to motorcycles from 188 in 1977 to 68 under the travel plan. And it limited motorcycles to those 68 trails, just limited their use to just seven weeks out of the year, while in 1977 motorcycles could use the area year-round. And it limited this time frame to, I think, sometime somewhere in the summer, because in the spring the ground is wet and therefore there could be more trail damage, and in the fall and winter there are grizzly bears hibernating or preparing to hibernate, so motorcycle use is precluded during that time. The Forest Service also reduced the area available to snowmobiles from 135,000 acres in 1977 to 11,000 acres under the plan, or from 15,000 of the most heavily used acres in 1977 to 11,000. In the Forest Supervisor's judgment, this was sufficient to maintain the wilderness character of the area, and you can find the Forest Supervisor's statement and opinion at page 261 of our Excerpts of Record. When you say wilderness character is maintained, as I understand it, the Study Act doesn't have a definition of wilderness character, although it asks you to maintain it. But the earlier Wilderness Act probably does define wilderness. Is that correct? That's correct. It defines it. And would you say that the Forest Service's interpretation of impact on the wilderness  I'm not sure I understand the question, but the Study Act, while motorized uses are prohibited by the Wilderness Act, they are allowed in study areas, so I don't know if you can compare the impacts on the two. Okay, thank you. And if the Court has no further questions, I'd like to reserve the remainder of my time. Thank you. Thank you. Counsel. Good morning. May it please the Court. My name is Kristi McCann. I, with Kyle Nelson and Kathy Loughner, are with Brown and Calzek, Berry and Hoven in Montana. We represent citizens for balanced use at all. I'm also going to be, we submitted a joint brief with Treasure State Alliance, the other recreation groups. Paul Turk is in the courtroom as well. And I will be speaking for all recreation groups combined, as opposed to switching out as we originally planned. Okay. As the Court pointed out earlier, the procedural aspects of this case are a little confusing. As you know, citizens for balanced use filed its own lawsuit, as did Montana Wilderness Association. Those suits were consolidated, and Treasure State intervened in Montana Wilderness' suit. Both of the underlying plaintiffs intervened in each other's suits. And so both Treasure State and Citizens for Balanced Use are here appealing the district court's ruling, granting the Wilderness Association's ruling based on the Montana Wilderness Study Act and NEPA. And that's related specifically to the Highlight Porcupine Buffalo Horn Wilderness Study Area. CBU's or citizens' claims are more general NEPA-based procedural claims, and they are related to the entire Gallatin National Forest Travel Plan. Unless the Court expresses a preference, I'm going to first address the recreation groups' appeal issues, and then I can move on to citizens' unique NEPA claims. Go ahead. Thank you for the road map. Thank you for the road map. My pleasure. The recreation groups believe that the district court erred when it set aside the travel plan for the study area, mostly because it did not grant proper deference to the Forest Service. It imposed extra statutory substantive requirements on the service that were not in the Montana Wilderness Study Act. And it improperly combined its analysis of the Wilderness Study Act with NEPA, which is purely a procedural statute. As far as proper deference to the service, as we all are well aware, Lands Council v. McNair, this Court's on-bank decision, kind of changed the course or reset the course of how judicial review of agency actions should be, and really kind of set it back to making sure that the arbitrary and capricious standard had some meaning. That doesn't mean there's no review. Agreed. Agreed. There is review. However, we believe that the Forest Service, in its travel plan for the Wilderness Study area, deserved more deference than it received. The district court really focused in on the volume of use data and how the Forest Service should have had some magic words in its EIS and Record of Decision, discussing specifically how that data affected its analysis. Summarize for me, if you can, why that was air, what the district court did, and as concisely as possible. Well, I believe that the Forest Service recognized that the volume of use data did not exist. The Forest Service then explained the methodology that it was going to use to evaluate the wilderness character and potential for inclusion in wilderness by using the WARS, the Wilderness Attribute Rating System, which was derived directly from the original Wilderness Statute that was passed before the Wilderness Study Act. And then it applied that methodology, identified its assumptions, and conducted its analysis in the best way possible. How does the WARS analysis, which was concerned with designating in the first instance, address the issue of maintaining the wilderness character? Well, I would submit that... In other words, like on the volume, where did WARS take into account volume of use at that time and the potential increase in volume? Well, I think you identified that earlier, Judge Fischer, when you mentioned that the solitude component of the WARS analysis seems most directly related to intensity of use and increasing volume of use. So isn't that why Judge Malloy focused on volume? Isn't that why he was concerned that there wasn't adequate explanation for how that got taken into account? Well, I believe that he did focus on that. However, I think that he lost sight of the fact that there was not data that existed. Well, that may be, but you still... The service has an obligation to explain. If it doesn't... If the data, the original data, the baseline isn't there, then what did they do to take into account the increase, the potential effects of volume? Now, we've heard today a counsel for the service saying, well, his fellow drove around and made some observations and the like. I'll just go back and look at what he cited in the record, but I think there's a hunger for some kind of explanation from the service in its report as to how it found the volume, just the a priori obvious effects of increased usage, how they considered it accounted for in the plan. Now, we've heard an explanation today. Whether that's in the report in a cogent way, I don't know. Well, I would submit that the Forest Service's reduction in both reconfiguration of access points, reduction in available acreage for snowmobiling and motorcycling and mountain biking, the motorized and mechanized uses, did account for the intensity of use changes. And Judge Malloy, in his order on page 12, did also note that it was possible that that reconfiguration did adequately deal with the change in intensity of use. And that part of the opinion actually is quite striking because under the arbitrary and capricious analysis, this Court has stated that absent a clear error, an agency's actions will be upheld. Judge Malloy, in his order, recognized that it was possible that the Forest Service did just fine in its analysis and decision that what it decided to do was sufficient to maintain 1977 wilderness character. Counsel, let me interject, if I may, a question related to that part of your argument. I could be wrong here, so correct me if I'm wrong. But I thought that the Lands Council case in part relied on an earlier Supreme Court case, which I think has the name State Farm in it, discussing what's arbitrary and capricious. And that one of the elements that the Supreme Court refers to is if an agency just doesn't address or fails to address adequately an important part of a problem. So maybe I'm mistaken, but I was thinking that that was part of the line that Judge Malloy was thinking about. That is indeed what Judge Malloy said in his opinion. I believe it's whether the agency entirely fails to consider an important aspect of the problem. So how did the agency consider increased usage? How did they consider impact of increased usage on the wilderness character of the area? Well, there are two parts of my answer to that question. The agency couldn't consider increased usage in a scientific way because the data did not exist. The agency did consider it by reconfiguring and greatly decreasing the area of use, which is the decreases further supported by the citations to the record we included in our briefing, which show that the use was very widespread in 1977 by mechanized and motorized vehicles. The second part of my answer to that question is that it wasn't an important aspect of the problem. As Mr. Brabender discussed at length, the Forest Service determined to comply with the 1977 Act and that it needed to really focus on the physical characteristics of the area. It's common sense that if the area does become designated a wilderness area, all of the uses that we're discussing today will stop. And so really the physical impacts of those uses are what need to be focused on, and those don't necessarily change with increased intensity of use. That's what the Forest Service concluded. Thank you, Councillor. You're welcome. And that's what the Forest Service concluded, and I believe that that conclusion was within their area of expertise and deserved deference from the district court. I'd like to just briefly discuss Citizens' Affirmative NEPA claims and then reserve what little time I might have left for rebuttal unless you have further questions. Go ahead. You have about four minutes. Thank you. Now, as you are well aware, NEPA was passed for two purposes. First, to make certain the agency has and will consider detailed information concerning significant environmental impacts of its actions, and also that the relevant information will be made available to the larger public audience and that there will be discourse with the larger public audience. Citizens believes that the integrity of NEPA was compromised in this case when the Forest Service didn't adequately address their concerns as communicated in their comments and those of Dr. Zahn, when the Forest Service failed to create a viable no-action alternative, when it did not consider a reasonable range of alternatives in light of the purpose and need of the travel plan, and when it failed to evaluate the cumulative effects of past decisions on motorized and mechanized recreation in light of that type of recreation's increasing popularity. Now, NEPA is, as you know, all about procedure. While environmental and conservation groups have consistently and with great success used NEPA to ensure their agenda is met for the past several decades, NEPA was not passed with only their interests in mind. It's meant to protect all citizen groups, including snowmobilers and motorcyclers and mountain bikers. And all users of our national forests. And we submit that citizens' claims, while they are technical, they do have merit and our client feels that their interests and the interests of their members and those they represent were harmed when the Forest Service disregarded their concerns. And that's related to the entire Gallatin National Forest Travel Plan, not solely the wilderness study area. Okay, thank you. If you don't have any further questions. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. My name is Timothy Presso on behalf of the appellees, the Montana Wilderness Association, Greater Yellowstone Coalition, and the Wilderness Society. I'd like to first address the issue of volume of use that the Court has already raised in its questions. The Forest Service's position that its obligations under the Study Act are exhausted if it merely preserves the physical integrity of the study area is incorrect under the governing statute. First, if we look at the language of the statute itself, the Forest Service faces two duties. A duty to preserve 19 to maintain 1977 wilderness character, but also a duty to maintain the opportunity for ultimate wilderness designation. Now, changes that affect the physical integrity of the area would trigger the latter duty, the duty to ensure opportunity for wilderness preservation, because once you have modified the physical parameters of the area. It's a temporary physical alteration. Then that goes to the first duty, the duty to maintain 1977 wilderness character. And if you read that duty to encompass only changes to physical, the physical landscape, then you've collapsed them into one. It talks about potential for wilderness designation. I'm sorry, Your Honor. The Act talks about, the Study Act talks about a potential for wilderness act designation. Yes. So what does that mean? Your Honor, I believe it means that the agency has to not clear-cut the area, not mine the area, and not scar it physically with the impacts. Well, how about, you know, it's a temporary road or trail that might be created by using all-terrain vehicles or something. I think the Forest Service's own policy has indicated those things are inappropriate. In the study area? Yes. When you're talking about things that affect the natural integrity, the physical landscape. The dispute in this case, I don't think they dispute that. What they dispute is, do we have to look at the number of users? And the point I'd like to make to the Court is, if you read the maintain 1977 wilderness character duty as offering nothing more than the potential, the maintain potential for wilderness designation duty, you've collapsed two obligations into one. And that's not appropriate under the statute. How does the Service then balance the two obligations? I think they're mutually reinforcing, Your Honor. I don't think there's not a tension. In fact, although the latter duty focuses more specifically on the congressional designation point and the ultimate potential for designation, it's also true, and the Forest Service recognizes this in its EIS, that if you've built in a constituency of non-wilderness users that have come on the scene since the study act was enacted, then you've created a political obstacle to wilderness designation, which is very much as... Well, the act doesn't preclude that. Well, what the act says is, please maintain, not please, but maintain the 1977 wilderness character. Well, it doesn't preclude. I mean, the argument you just made, I don't see how that is inconsistent with the basic premise of the act, of the study act. Well, Your Honor, if you're increasing the number of non-wilderness users, the volume, then you're not maintaining the 1977... All-terrain vehicles, I guess, didn't exist in 1977. I don't know. I never know much about all-terrain vehicles, but... That's correct. They did not. But motorcycles did in much smaller numbers than used the study area today, and snowmobiles did, both in much smaller numbers and in less powerful versions than used the study act today. Let me ask you this. You know, one of the things about this intensity of use, the volume of use, is the Forest Service doesn't have any good data on use. That's correct. Right? So what are they supposed to do in light of that? Well, first of all, let's... Create the data? I'm sorry? Collect the data, or what? It's not... Clearly, it's impossible for the Forest Service to go back to 1977 and collect data they did not collect at the time. But the Forest Service is not without indicators that it can utilize in reaching a decision. If we look at the record, and this is summarized in our brief, we see that snowmobiling levels throughout this portion of the entire forest have about doubled since 1977. We see recreation participation data, both regionally and nationally, showing a massive increase in off-road driving. The Forest Service does not have perfect data, but I'd ask the court to consider how many times it has seen these resource agencies come before this court with imperfect data on all kinds of issues, air quality, wildlife impacts. So what would be the surrogate measurements that you would have them put into the EIS so that it would be satisfactory to what you're reading of the act? Well, first of all, what we would say is we agree that if the Forest Service will actually grapple with the issue, it is the Forest Service's prerogative to choose those parameters. But what I would suggest is there are indicators in terms of, as we have stated, the increase in snowmobiling throughout that entire portion of the forest is obviously an indicator of likely increases within the study area. There are indicators of the increase in... How many, if you don't know how many snowmobiles, were there snowmobiles in 77? Yes. Okay, there were snowmobiles. Okay, so now the usage has increased. Yes. Everybody agrees with that? Yes. Okay, and so snowmobiles are not confined to trails, is that correct? That is correct. Okay, so snowmobiles will be penetrating into areas previously either inaccessible... Now you have people who might have hiked there on foot, they're using snowmobiles. Yes. Okay, so how did the EIS, FEIS address that? It did not. It said we don't have perfect data, therefore we will not consider the issue. So what did they do with snowmobiles? What they did to snowmobiles was they increased the geographic footprint from 1977. So your argument is that unless by some magic that there's no impact at all of increasing it, they can't increase the area for snowmobiles. Our argument is certainly that's correct. I think when you've got more users affecting a larger area, it's hard to sum that equation up without finding a degradation of wilderness character. Okay, so even though the area is for purposes of solitude and the like, but it's for enjoyment of the users and it's also for protection of the physical characteristics of the area, trees and whatever, the ground and the wildlife. You're saying that the service basically, if there's anything that's going to depart from existing trails and expand the usage, be it in the winter by snowmobiles or in the non-winter by ATVs, essentially your position is too bad because any increase in volume is going to affect, in one way or another, from either physical to social, is going to degrade the wilderness character that existed in 1977. I think that is correct. Increases in volume will degrade the wilderness character and it's not just our position. If you look at the Forest Service's internal regional directive, which is in the excerpts of record promulgated in October 2006, the same time as this travel plan, in that regional directive they say if increases in the volume of use have occurred, they must be considered to identify the impact on wilderness character. They would be considered, yeah. Yes. But that wasn't my question. I understand the thrust of your argument to be they can consider them all they want, but by definition they expand the usage in what was heretofore accessible only by hikers. So, therefore, you would not be maintaining the character because, by definition, they will either rut snowmobiles, basically deprive users of fresh powder. I think I understand your question better. That's my concern. That's very temporary. But the ATVs go along and if they go off-road, they're going to be creating ruts and things like that wherever they go. That's correct. But what I would say, Your Honor, is the statute requires the agency to maintain 1977 wilderness character. If the Forest Service can identify some way that an increase in volume maintains 1977 wilderness character, once it actually grapples with the issue, then that's something that we can look at and see if there's a legitimate rationale there. But the agency can't engage in that analysis if it simply says, we will not consider increases in the volume of use, we will look only to physical parameters, and that's what they did here. I want to mention to the Court a separate statutory anchor for this volume of use issue, which is if we look at the legislative history of the language that's embodied in the Montana Wilderness Study Act, it arose two years previously in the 1975 Eastern Wilderness Areas Act. What we see in the legislative history of that act is that Congress focused on maintaining existing uses within the study area with that language, not just physical parameters. Of course, there's a well-established statutory construction principle that when you have two statutes enacted in sequence like this that use the same language, we assume that Congress had the same meaning. Indeed, this language is repeated in a number of the wilderness acts and wilderness study acts from the 1980s, including the Wyoming Act addressed in the District of Idaho Greater Yellowstone Coalition, the Timchak case, which is cited in the briefing. I also want to address, Your Honor, the government has argued that there was a geographic restriction from 1977. I want to make sure the Court understands the dispute we have with the government on that point is they want to talk about areas that were open to various uses in 1977 versus areas that are open to those uses under the challenged plan. Our point is, as they concede, the actual use areas in 1977 were much smaller than the areas that were open in 1977. When we talk about existing uses in 1977, we look at the areas that were actually used, not the theoretical uses that did not occur. The wilderness character in 1977 is defined by those actual uses. When we start talking about actual uses in 1977 versus under the plan, what we see is an increase in the snowmobile footprint from 15,000 to 18,000 acres and an increase in the summer trail system from 142 to 168 trail miles. I want to make clear, as to that latter point, the Forest Service says, no, we actually decreased the trail miles from 188 to 168. The problem with that is they recognize that there were 46 miles of trail in 1977 that had no lawful access and therefore no regular use. Yet they fail to account for that when they undertake their wilderness character analysis. They just treat all those trails as uniform in their usage and define wilderness character in that way. We submit that the Forest Service must take account of the fact that without lawful access, there was little to no use and therefore it's not sufficient for the agency just to say, oh, we've reduced the trail miles when, in fact, if you look at regular use trails, there was an increase in the trail miles. I want to come back to, and I think, I'm not sure I was 100% clear, when the court asked about this issue of the agency being in what it likes to refer as an impossible position. We don't have perfect data. The point I was attempting to make to the court was that we often see the agency grapple with imperfect data. And as long as the agency grapples with the data it has and articulates a rational connection between the facts found and the choice made, it has survived APA review. And that's all we ask the agency to do in this case. Look at the data it has, address the relevant issues, and articulate a rational response. Don't turn a blind eye to a relevant issue. The government also began its argument by saying both sides are mad at us, we must be doing something right. The problem with that is this is not the typical multiple use balancing act that the agency must engage in, where it's got polarized interests, it tries to strike a balance in the public interest, and maybe it is an indicator in some cases when both sides are mad. But the problem here is there is a statutory threshold, maintain 1977 wilderness character. The satisfaction of that threshold is not determined by whether both sides are mad at you. And that's the mistake the government made. I don't want to jump ahead to the cases on the calendar, but just for practical purposes, when the district court ordered a remand to the agency, what is the agency supposed to do to comply with Judge Malloy's order? I think, Your Honor, they have to go back and look at the information they have, part of which is anecdotal, part of which is regional and has to be extrapolated, and make a judgment as to what has been the increase. And then they have to determine how they are going to respond to that increase. Now, in the district court, what they told the court was, we reduce the geographic footprint to address the increase in volume. They appear now to object to that methodology. It's one they came up with themselves, and we agree that may be an option, a legitimate way for the agency to address it if it wishes to go that direction. But first, it has to look at the relevant issue of increase in volume, and that's where the process just stopped dead here. They said, no, we're not going to look at that, and that's why we brought this suit, because we knew if we go in a position, if we continue with ever-escalating motorized and mechanized recreation, there will never be an opportunity to designate a wilderness here, and that's not what Congress intended. My time has expired. I thank the Court for its attention. Thank you. Counsel? Thank you, Your Honor. I just want to make some factual points very clear. The agency did reduce the levels of motorized use from 1977. Now, what we object to is a legal requirement requiring the agency to do so. That's how the agency chose to deal with increased use in this situation. But there may be other situations where this is not the proper way to deal with an increase in use, to offset any increases in use with corresponding decreases in access. Now, how does that relate to what counsel just said, though, that you may be able to address the increased volume by a remedial act of reducing the area of use, but why isn't that tied to the factor of increased volume, as opposed to saying we don't need it? Well, again, it all comes down to we think the volume is addressed through looking to the actual physical characteristics. Counsel, I look at that, and it says, well, there are things we look at, you know, distance from city lights. We look at impact on trails. We look on topography. We look on vegetation. I don't find an explanation for how the reduction relates to the physical aspect of the surround of the trails or whatever. I mean, it's as if you say, well, we have it in mind, and there are ways to do it, but I think what we're searching for is how did you figure it out? I mean, why are we making up the arguments for you, or the explanation, I should say? Well, maybe it's implied within the record, but that's what the Forest Service did here. The Forest Service reduced the areas open to snowmobiles, the areas open to motorized vehicles, in order to offset any increase in volume of use. So, for instance, the Forest Service said that that's what it was doing. Well, I think what the Forest Supervisor said is these levels of motorized use will maintain the wilderness character of the area, and when he said that, he meant these reductions will adequately offset any increase in volume of use. So we should accept that the geographical area will maintain the wilderness characteristics because the Supervisor thinks so? Yes, Your Honor. Even though he didn't go on to explain because, or we just take the obvious that if you reduce the number, then you're confining to an area, and it may destroy that particular area with all of this concentrated use, but it won't affect the, quote, wilderness character of the overall study area? I think that's right, Your Honor. Is that what they said? They didn't say that explicitly, no. All right. So we have to make the explanation for them. Okay, Your Honor. I see that I'm out of time, unless you have any... Counsel, if I could ask you one question, if Judge Fischer doesn't object. No, I don't object. I wanted to try to refine the question I asked you earlier. When we assess what is the meaning of wilderness character under the Study Act, should we look to the definition of wilderness in the prior Wilderness Act? Well, that's what the Forest Service did here. It looks to the description of wilderness in the Wilderness Act, and it came up with a four-factor analysis based on the physical attributes of the wilderness, its natural integrity, its apparent naturalness, its opportunities for solitude, and its opportunities for primitive recreation. Okay, thank you, Your Honor. Thank you. Thank you. She still has a minute or two left. Thank you. Just as a first point, we've heard a lot of discussion about how the Montana Wilderness Association believes that the Forest Service has actually increased acreage. Their continual insistence on disputing the facts in the record almost make me feel like maybe this isn't appropriate for summary judgment. But it seems like we need to remember that the Forest Service concluded that it did decrease the acreage available, and the record is the record, and we shouldn't be disputing the facts here. I'm going to wait. Now, let's wait until we figure out what's causing the noise. We are. We're waiting. Or until they hang up. If you're calling us, Judge Gould, we're not going to answer. Yeah, I'm not calling. Okay. I'm just glad it's not coming from my purse over there. Yeah, that's the person I did with. Everybody's reaching for their cell phones. Okay, can we turn something down? To turn the speaker down. It's, yeah. Okay, a magic touch. Secondly, the Montana Wilderness Study Act does not require that the Forest Service place an area in suspended animation. The Eastern Acts that counsel referenced were not the same language. The Montana Wilderness Study Act did not mention uses. It simply says that the Forest Service must maintain the wilderness character and the potential for inclusion in wilderness. And lastly, the Forest Service was tasked with examining the entire, the character of the entire study area. In the 1985 study, they concluded that the wilderness area, study area was not suitable for designation, and that was mainly due to the private inholdings that composed about a third of the acreage in the study area. The Forest Service examined all of those factors when it concluded that its reconfiguration of motorized and mechanized uses did preserve the wilderness character of the area. Today, the Forest Service has purchased or exchanged 37,000 of the 50,000 to 55,000 acres that were private inholdings. It appears that the acts. This is all in your brief, and we do have that. Okay. Okay. You're over time now, so I think we're okay. All right. Well, thank you very much for your time. It's not counting down anymore. Oh. Thank you. It's tricky right now. Thank you all. We appreciate the arguments. And the case is submitted.
judges: Fisher, Gould, Paez